

**U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

**ENTERED**
**TAWANA C. MARSHALL, CLERK**
**THE DATE OF ENTRY IS**
**ON THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed October 5, 2015**

**United States Bankruptcy Judge**

_____

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 13-34893-BJH |
| | § | (Chapter 11) |
| TX OK AIR, L.L.C., | § | |
| | § | Related to ECF No. 89 |
| DEBTOR. | § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Before the Court is TX OK Air, LLC's Objection to Claim No. 2 of the Texas Comptroller of Public Accounts [ECF No. 89] (the "**Claim Objection**"). The Claim Objection was heard on September 21, 2015 (the "**Hearing**"). The Court's findings of fact and conclusions of law are set forth below.

**Statement of Stipulated Facts**[1]

---

[1] TX OK Air, LLC ("**TX OK**" or the "**Debtor**") and the Texas Comptroller of Public Accounts (the "**Comptroller**") filed a Joint Contested Findings of Fact and Conclusions of Law on September 16, 2015 [ECF No. 135] (the "**Joint Filing**"), which contained these stipulated facts along with the parties' respective contested issues of fact and law. Except for placing defined terms in bold for ease of reference, the Court adopts the parties' stipulated facts verbatim as part of its Findings of Fact and Conclusions of Law.

1. TX OK is a Texas limited liability company, formed in 2004.

2. On April 4, 2007, TX OK purchased a Cessna 525 aircraft bearing FAA tail number N118CS (the tail number is now N774GE) (hereinafter, the "**Aircraft**") from CitationShares Sales, Inc. The purchase price was $2,650,000.00.

3. The Aircraft is TX OK's most significant asset.

4. Debtor took delivery of the Aircraft outside of Texas.

5. Debtor did not have a sales tax permit and did not issue a resale certificate to the seller.

6. Debtor did not remit sales or use tax on the purchase of the Aircraft.

7. Immediately after taking delivery of the Aircraft, on May 17, 2007, TX OK entered into an Air Carrier Lease Operations and Management Agreement (the "**Lease**")[2] with BAM Denton Management Ventures, LLC d/b/a Business Air Management ("**BAM**").

8. BAM is a licensed and certified air carrier under Federal Aviation Regulations (14 C.F.R. Part 135) that has been in business since November 1, 2001. BAM currently offers commercial charter services using several different aircraft.

9. At the time of the purchase of the Aircraft, Dr. Graves was a minority interest holder in BAM holding 10% or less of the interests.

10. Debtor engaged BAM to lease, operate, and manage the Aircraft pursuant to the terms and provisions of BAM's Federal Aviation Regulation Part 135 Air Carrier Certificate.

11. BAM agreed to charter Part 135 flights at charter rates acceptable to Debtor.

---

[2] The Joint Filing defines the term "Lease," but then appears to refer to that document as both the "Lease" and the "Agreement" (although Agreement is not a defined term in the Joint Filing). Accordingly, the parties' Statement of Stipulated Facts (quoted verbatim herein) uses the terms interchangeably. The Court's additional findings of fact and conclusions of law only refer to the Lease.

FINDINGS OF FACT AND CONCLUSIONS OF LAW                                                                    2

12. TX OK entered into the Lease with BAM for the operation and management of the Aircraft. TX OK agreed to pay BAM fees and expense reimbursements.

13. TX OK is responsible for the operating and maintenance expenses associated with the Aircraft.

14. Pursuant to the Lease, BAM agrees to supervise flight and maintenance personnel, assist in coordinating scheduled and unscheduled Aircraft maintenance and provide oversight for same; act as FAA liaison; manage and maintain record keeping, reporting, budgeting, payment of Aircraft related invoices, provide Aircraft, passenger, and Flight Support Personnel scheduling and travel support services, provide all charter invoicing, credit and collections services, and be responsible for securing alternative transportation arrangements if the Aircraft develops mechanical or technical problems.

15. Debtor was responsible for the Aircraft's operating expenses including such costs incurred by BAM as repairs, maintenance, and service of the Aircraft; maintenance labor; third party services for technical support of the Aircraft; engine and airframe maintenance service plan fees; landing, parking, handling, customs, airways, and overnight fees; hangar fees; computer flight plans; navigation, operations, and maintenance publications; and inflight services such as catering, supplies, and entertainment materials.

16. BAM invoiced Debtor for the operating expenses on a monthly basis.

17. The Agreement accorded BAM operational control for all flights, which means the exercise of authority over initiating, conducting, or terminating a flight.

18. Section 5.3 [of the Lease] provides that:

If the Aircraft is needed for a BAM trip, BAM will schedule the Aircraft only after verifying its availability directly with Owner [Debtor]. Owner may accept or reject any such BAM Trip at Owner's sole discretion. Once a BAM Trip is confirmed with Owner and booked, Owner shall not cancel such BAM Trip

without any prior approval of BAM, which approval shall not be unreasonably withheld, provided, however, that Owner shall reimburse BAM for its reasonable differential out-of-pocket costs and expenses for either canceling such a BAM Trip or rescheduling such a BAM Trip on a comparable type and make of aircraft.

19. Section 1.6.4 of the Agreement defines "BAM Trips" as "any Flight wherein the charter customer is provided, directly or indirectly, by BAM."

20. Section 1.6.5 of the Agreement defines "Owner Trips" as "any Flight wherein the charter customer is the Aircraft Owner, Dr. Gregory A. Echt . . . Dr. Nathan L. Graves . . . their family and guests."

21. Section 1.6.6 of the Agreement defines "Owner Charters" as "any Flight wherein the charter customer is the Prostate See Institute or other entity under the control of Dr. Echt or Dr. Graves."

22. The Aircraft is housed at BAM's facility in Denton, Texas and BAM markets the Aircraft to its charter customers.

23. In the first year of the Lease, the Aircraft flew approximately 410 hours of charter with outside entities.

24. The Lease grants BAM operational control of the Aircraft, as defined by the FAA in 14 C.F.R. 1.1, for all flights conducted under the Lease.

25. The taxes and interest demanded in the Comptroller Claim, filed as Proof of Claim #2, have been the subject of an ongoing dispute between TX OK and the Comptroller. The Comptroller assessed over $250,000.00 in taxes and interest against TX OK.

26. The Comptroller rejected Debtor's exemption claim.

27. On April 9, 2010, the Comptroller issued a Texas Notification of Exam Results (the "**Notification**") assessing a sales/use tax deficiency against TX OK pursuant to Tex. Tax Code Ann. § 151.101(a) thus initiating a tax dispute and assessing a deficiency against Debtor

for the exam period May 1, 2007, through April 30, 2008, consisting of tax in the amount of $218,625.00, and interest in the amount of $37,217.20, which accrued through the date of notification. The Comptroller waived any penalty on the assessment.

28. The tax was calculated by applying the applicable tax rate of 8.25% to the Aircrafts $2,650,000.00 purchase price.

29. Debtor timely requested redetermination of the assessment.

30. On May 2, 2013, the Comptroller referred the case to the State Office of Administrative Hearings ("**SOAH**") for a hearing based on the parties' written submissions.

31. On July 16, 2013, the Administrative Law Judge issued his Proposal for Decision. The Proposal for Decision upheld the Comptroller's assessment.

32. On or about May 9, 2013, the Comptroller issued a Notice of Hearing by Written Submission. On or about August 30, 2013, the Comptroller issued its Comptroller's Decision No. 106,185 (2013). On or about September 23, 2013, TX OK timely filed a motion for rehearing.

33. On September 25, 2013, Debtor filed its pending bankruptcy case. This bankruptcy case was filed before the Comptroller's Decision No. 106,185 (2013) became final.

34. On October 21, 2013, Comptroller timely filed its priority proof of claim ("**Claim No. 2**") in the amount of $287,993.55. The claim is based wholly on the audit assessment and includes tax in the amount of $218,625.00 and interest in the amount of $69,368.55.

35. On September 2, 2014, Debtor filed its Objection to Claim No. 2.

**The Court's Additional Findings of Fact and Conclusions of Law**

1. The Court has jurisdiction over the Debtor's bankruptcy case and the Claim Objection under 28 U.S.C. § 1334.

2. The Claim Objection is a core proceeding under 28 U.S.C. § 157(b)(2).

3. Venue before this Court is appropriate under 28 U.S.C. §§ 1408 and 1409.

4. Federal Rule of Bankruptcy Procedure 3007 and 11 U.S.C. §§ 502 and 505 provide the legal predicate for the relief sought.

5. Section 505(a)(1) provides:

Except as provided in paragraph (2) of this subsection, the court may determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction.

11 U.S.C. § 505(a)(1).

6. Section 505(a)(2) provides:

The court may not so determine–

(A) the amount or legality of a tax, fine, penalty, or addition to tax if such amount or legality was contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction before the commencement of the case under this title;

(B) any right of the estate to a tax refund, before the earlier of –

(i) 120 days after the trustee properly requests such refund from the governmental unit from which such refund is claimed; or

(ii) a determination by such governmental unit of such request; or

(C) the amount or legality of any amount arising in connection with an ad valorem tax on real or personal property of the estate, if the applicable period for contesting or redetermining that amount under the applicable nonbankruptcy law has expired.

11 U.S.C. § 505(a)(2).

7. Thus, § 505 of the Bankruptcy Code vests in this Court broad power to hear tax disputes. *I.R.S. v. Luongo (In re Luongo)*, 259 F.3d 323, 329 (5th Cir. 2001). Moreover, § 502(b) of the Bankruptcy Code provides that a claim is not allowed if "such claim is

unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." 11 U.S.C. § 502(b)(1).

8. As the Supreme Court has held, "in the absence of modification expressed in the Bankruptcy Code the burden of proof on a tax claim in bankruptcy remains where the substantive tax law puts it." *Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 24 (2000). Here, given the procedural posture of this dispute prior to the Debtor's bankruptcy filing, Texas law puts a "heavy burden" of proof on the Debtor. As explained by the court in *Sundown Farms, Inc. v. State of Texas*:

> A taxpayer attempting to deny responsibility for taxes faces a heavy burden once the comptroller produces a certificate showing the amount of taxes that are delinquent. The certificate is prima facie evidence of both the delinquency and the amounts owed. … [A] taxpayer has the burden to overcome a deficiency certificate's presumed correctness with such evidence tending to support the contrary as would be conclusive, or evidence which would be so clear and positive it would be unreasonable not to give effect to it as conclusive. Statutory exemptions from taxation are subject to strict construction since they are the 'antithesis of equality and uniformity and because they place a greater burden on other tax paying businesses and individuals.' All doubts as to the availability of an exemption must be resolved in favor of the taxing authority and against the claimant.

89 S.W.3d 291, 293 (Tex. App. –Austin 2002, no pet.).

9. The Debtor claims that its purchase of the Aircraft was exempt from taxation under the so-called "sale for resale exemption" provided by Texas law. Specifically, § 151.302 of the Texas Tax Code provides that "[t]he sale for resale of a taxable item is exempted from the taxes imposed by this chapter." Tex. Tax Code Ann. § 151.302(a). "Sale for resale" means, in relevant part, a sale of:

> (2) tangible personal property to a purchaser for the sole purpose of the purchaser's leasing or renting it in the United States of America or a possession or

> territory of the United States of America or in the United Mexican States in the normal course of business to another person . . .

*Id.* § 151.006(2). Thus, the "sale for resale" exemption provides that tangible personal property is not subject to tax if the purchaser acquires the property for the sole purpose of leasing or renting it in the normal course of business. *Id.* § 151.006(2).

10. If the requirements for its application are satisfied, the exception can apply to the Debtor's purchase of the Aircraft. As relevant here, and as explained more fully below, for the Debtor to prevail in the Claim Objection, it must prove that it purchased the Aircraft for the sole purpose of leasing the Aircraft to a third party in the normal course of business. And, as Debtor's counsel conceded at the Hearing, because the Comptroller issued the Notification prepetition, the Debtor must overcome the presumed correctness of the Notification with evidence that is "so clear and positive that it is unreasonable not to give effect to it as conclusive." *Sundown Farms,* 89 S.W.3d at 293. For the reasons explained below, the Debtor has not satisfied its "heavy burden" of proof. *Id.*

11. There is either no dispute, or the Court finds and concludes, that: (i) post-acquisition, the Debtor leased the Aircraft to BAM pursuant to the terms of the Lease, (ii) BAM is a licensed certificated air carrier operating pursuant to 14 C.F.R. Part 135 of the Federal Aviation Regulations, (iii) the Lease grants BAM possession and exclusive operational control (which means the exercise of authority over initiating, conducting, or terminating a flight, subject to the Pilot-in-Command's authority for all safety flight matters over the Aircraft's flights)[3] and BAM retained exclusive operational control of the Aircraft, (iv) BAM operated the Aircraft under the Lease in accordance with BAM's Air Carrier Certificate number JMOA8941 issued by the FAA to BAM, (v) the Lease is a valid lease that meets the requirements of Federal Aviation

---

[3] *See* 14 CFR § 1.1.

FINDINGS OF FACT AND CONCLUSIONS OF LAW 8

Regulations Part 135, (vi) under the FAA's rules found at 14 C.F.R. § 91.501(b)(5), TX OK does not qualify to act as an operator of the Aircraft, (vii) as relevant here, BAM is the only party that could legally serve as the operator of the Aircraft, (viii) under Operations Specifications A008 "Operational Control" - issued to BAM in connection with its air carrier certificate and approved by the FAA - BAM retains all responsibility for operational control of all aircraft identified on its air carrier certificate, including the Aircraft, (viii) under BAM's A008, BAM's operational control of the Aircraft cannot be transferred to any other person or entity, (ix) under BAM's A008, BAM's responsibility for operational control of the Aircraft supersedes any agreement, contract, understanding or arrangement, either oral or written, express or implied, between any person or entity, and (x) the Lease qualifies as a lease under Texas law and Comptroller's Administrative Rules, which defines "lease" or "rental" as a "transaction, by whatever name called, in which possession but not title to tangible personal property is transferred for a consideration," Tex. Admin. Code § 3.294(a)(2); Comptroller's Decision No. 106,185, p. 6 (2013).

12. However, while extensive evidence was put on concerning the findings and conclusions set forth in paragraph 11 above, those findings and conclusions are not dispositive of the factual and legal issues that are principally in dispute between the parties with respect to Claim No. 2. Specifically, the principal dispute between the parties is whether the Debtor's sole purpose in purchasing the Aircraft was to lease it to BAM in the normal course of business, thus entitling it to the sale for resale exemption from sales tax under Texas law.

13. Based upon the evidence adduced at the Hearing, the Court finds and concludes that the Debtor leased the Aircraft to BAM in the normal course of business, which leaves what the Debtor's purpose was in purchasing the Aircraft as the remaining disputed factual issue. Specifically, were there dual purposes to the Debtor's purchase of the Aircraft as the Comptroller

contends – *i.e.*, (1) to make the Aircraft available to its members on more favorable terms than would be available to the general public, and (2) to lease the Aircraft to BAM for charter services – or was there a single purpose to the Debtor's purchase of the Aircraft as the Debtor contends – *i.e.*, to lease the Aircraft to BAM for charter services.

14. The evidence on this issue is conflicting. Specifically, the documentary evidence is inconsistent with the oral testimony. For example, as of May 2, 2007, shortly before the Aircraft was purchased, the Debtor's two members signed a Restated and Amended Limited Liability Company Operating Agreement and Regulations (the "**LLC Agreement**"). TX OK Ex. 17. Pursuant to § 15 of the LLC Agreement, entitled "Aircraft Operation," the Debtor's members agreed to certain terms to govern their use of the Aircraft, among other things. *Id.* Specifically, § 15.4 of the LLC Agreement dictates how the members can schedule their respective use of the Aircraft, including detailed terms governing the use of the Aircraft on certain defined Holidays, among other things. Moreover, §15.3 of the LLC Agreement provides that

> [t]he Company is authorized and directed [to] … negotiate and enter into a Lease and Management Agreement with an Operator for operation of any aircraft owned by the Company. The Operator will use the Company's aircraft for charter services, providing the Company with a share of the revenue generated from such services. In addition, *the Operator will provide charter services to the Members on terms and conditions more favorable than those offered to [the] general public*.

*Id.* § 15.3 (emphasis added).

15. Moreover, the Lease contains a right of first refusal provision which specifies that "[i]f the Aircraft is needed for a BAM Trip, BAM will schedule the Aircraft only after verifying its availability directly with Owner. Owner may accept or reject any such BAM trip at Owner's sole discretion." Lease [TX OK Ex. 1] § 5.3. TX OK is defined as "Owner" in the Lease. *Id*. at 1 (preamble). And, as the parties' stipulated, "Owner Trips" is defined in the Lease as "any flight

wherein the charter customer is the Aircraft Owner, Dr. Gregory A Echt …, Dr. Nathan L. Graves …, their family and guests." *Id*. § 1.6.5. Dr. Echt and Dr. Graves are the Debtor's members, each owning a 50% interest in the Debtor. TX OK Ex. 17 at Ex. A.

16. The Comptroller's sole witness, Christina Heath, who is an audit group supervisor in the Comptroller's Business Activity Research Team, testified that she reviewed various documents, including the LLC Agreement and the Lease, and that these provisions, among other things, caused the Comptroller to conclude that the Debtor's purchase of the Aircraft had dual purposes – to provide the Aircraft to its members on more favorable terms than those available to the general public and to lease the Aircraft to BAM for charter services to help offset the cost of the Debtor's ownership of the Aircraft.

17. On the other hand, the Debtor introduced the testimony of four witnesses – two expert witnesses and two fact witnesses. Francis M. DeJoseph, a long-time former FAA employee and now consultant, testified, among other things, that the Lease is (i) a valid lease and meets the requirements of Federal Aviation Regulations part 135, and (ii) a common type of lease used in the aviation industry. William de Decker, an admitted aviation expert who owns his own consulting firm, was asked to analyze the Comptroller's arguments and opine on whether he found the arguments persuasive.[4] In short, and not surprisingly, he did not. Among other things, Mr. de Decker testified that: (i) the Lease represented an arms-length transaction, (ii) the Lease is valid and leases like it are common in the industry, (iii) there was economic substance to the lease transaction between BAM and the Debtor, (iv) the right of first refusal in the Lease is not problematic because he was told that the provision was not enforced and because he believed BAM would have strongly

---

[4] While much of Mr. de Decker's testimony was likely objectionable, the Comptroller did not object to its admission.

FINDINGS OF FACT AND CONCLUSIONS OF LAW                                                                 11

objected if the provision interfered with BAM's operational control of the Aircraft,[5] and (v) the Aircraft was purchased by the Debtor for the sole purpose of leasing it to BAM because the Debtor had no employees to operate or maintain the Aircraft and it was leased to BAM eight (8) days after TX OK took delivery of the Aircraft.

18. Patrick Hall, the Director of Maintenance and Vice President of Operations for BAM, testified that his standing instruction from the Debtor when the Lease was entered into was to "lease the heck out of the Aircraft," or words to that effect. Hall also testified that, among other things: (i) the Lease was a form of lease used by BAM, (ii) once the Aircraft was delivered to BAM, he considered it to be BAM's aircraft, (iii) BAM had operational control over the Aircraft at all times, (iv) BAM never verified the availability of the Aircraft with the Owner as required by § 5.3 of the Lease, and (vi) he believed that the Operations Specifications issued by the FAA (A008), specifically paragraph b.(3) of A008, superseded any such requirement contained in the Lease.[6]

19. The Debtor's final witness, Holli Williams, is a CPA who works for a company owned by Dr. Echt, one of the Debtor's members. She testified as a "designated corporate representative" of the Debtor, without objection by the Comptroller. Ms. Williams testified about the amounts paid by the Debtor's members when they scheduled a flight on the Aircraft with BAM. In essence, she testified that the members paid the operational costs associated with the use of the Aircraft like any other charter customer, but that they did not pay what was essentially a marketing fee to BAM because BAM did not have to market the Aircraft to them. When asked what the

---

[5] The Court finds a difference between the right of first refusal contained in the Lease and operational control of the Aircraft as defined by the FAA. This distinction was blurred by the Debtor in its analysis of the legal issues here. From the Court's perspective, the Debtor, acting through its members, can require that it be consulted about scheduling the use of the Aircraft. Once use of the Aircraft was scheduled, however, BAM exercised complete authority over initiating, conducting, or terminating a flight, which is the FAA's definition of operational control.

[6] The Court disagrees. *See* n.5, *supra*.

Debtor's purpose was in purchasing the Aircraft, she testified that she "understood" the sole purpose to have been to lease the Aircraft to BAM.[7]

20. As noted previously, since the Comptroller issued the Notification prepetition, the Debtor must overcome the Notification's "presumed correctness with such evidence tending to support the contrary as would be conclusive, or evidence which would be so clear and positive it would be unreasonable not to give effect to it as conclusive." *Sundown Farms,* 89 S.W.3d at 293 (internal quotation and citation omitted). As the *Sundown Farms* court explained, "[s]tatutory exemptions from taxation are subject to strict construction since they are the 'antithesis of equality and uniformity and because they place a greater burden on other tax paying businesses and individuals.' All doubts as to the availability of an exemption must be resolved in favor of the taxing authority and against the claimant." *Id.* (citing *Bullock v. Nat'l Bancshares Corp.*, 584 S.W.2d 268, 274 (Tex. 1979)).

21. Given this admittedly "heavy burden" on the Debtor, and given the fact that there are only two individuals who can competently testify as to the Debtor's intent when purchasing the Aircraft, the Court was surprised that neither of the Debtor's members testified at the Hearing, particularly when the issue in dispute – *i.e.*, the Debtor's intent when purchasing the Aircraft - was entirely and exclusively within their personal knowledge.

22. Ms. Williams, who has never worked for the Debtor and did not even work for Dr. Echt when the Aircraft was purchased, can only repeat what she was told – presumably by

---

[7] Ms. Williams sometimes predicated her testimony with words to the effect of "I've been told …." These statements of "I've been told" or "I understand" caused the Court to infer that Ms. Williams did not work for the Debtor's member at the time the Aircraft was purchased and then leased to BAM and that she was simply repeating what she had been told by one of the members. Again, this testimony was likely objectionable, but the Comptroller did not object to its admission. During closing arguments, counsel for the Debtor confirmed that Ms. Williams did not become employed by one of the Debtor's members until 2009, some two years after the events at issue here. While Ms. Williams' testimony is in evidence and before the Court, the weight to be accorded to such evidence is limited by her lack of personal knowledge.

Dr. Echt and/or Dr. Graves. While Mr. Hall testified about the Lease and what Dr. Echt and/or Dr. Graves told him when the Aircraft was leased to BAM – *i.e*., to lease the heck out of the Aircraft, he did not (and could not credibly) testify as to the Debtor's intent when it purchased the Aircraft as he is not a member of the Debtor. Mr. DeJoseph's expert opinions did not address the issue of the Debtor's intent at the time the Aircraft was purchased. And, while Mr. de Decker did opine that the Aircraft was purchased by the Debtor for the sole purpose of leasing it to BAM, his opinion is based upon (i) his review of the same documents that the Court has reviewed, which contain provisions inconsistent with his opinion, and (ii) his experience in the aviation industry, which doesn't really assist the Court in determining the Debtor's actual intent at the time of the purchase of the Aircraft.

23. As the only members of the Debtor, Dr. Echt and/or Dr. Graves could have testified credibly with respect to the Debtor's intent at the time the Aircraft was purchased, but chose not to do so. Given the terms of the LLC Agreement and the Lease, and the absence of credible evidence regarding the Debtor's actual intent at the time of the purchase of the Aircraft, the Court cannot find that the Debtor carried its burden of proof at the Hearing. Based upon the record made at the Hearing, the Court has doubts about the availability of the sale for resale exemption under Texas law, which "must be resolved in favor of the taxing authority and against the claimant." *Sundown Farms,* 89 S.W.3d at 293. In other words, the Debtor did not introduce evidence "so clear and positive [that] it would be unreasonable not to give effect to it as conclusive." *Id*.

24. For these reasons, the Claim Objection is overruled and Claim No. 2 is allowed in its entirety.

### # # # END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW # # #